## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.  21-2682

KENDALL AUSTIN,

       *Plaintiff*,

V.

SHERIFF TYLER S. BROWN IN HIS OFFICIAL CAPACITY, OFFICER BRUCE PETERSON, DETECTIVE NICKI BALES, AND INVESTIGATOR MIKE DICKSON; in their personal capacities,

       *Defendants*.

---

## SECOND AMENDED CIVIL RIGHTS COMPLAINT WITH REQUEST FOR TRIAL BY JURY

---

Plaintiff Kendall Austin, by and through his attorneys, David Fisher and Michael Thompson, complains against the Defendants and requests a trial by jury as follows:

### INTRODUCTION

1.  This case arises from the malicious prosecution of Kendall Austin by the Defendants. Mr. Austin was interviewed several times by the Defendants and was eventually coerced into confessing to a murder that he did not commit and that he had no involvement in whatsoever. The Defendants obtained this coerced confession by contaminating his interviews with important details of the crime.  The Defendants also made various threats to Mr. Austin to get him to confess to the crime.  The Defendants also made various promises of leniency which induced Mr. Austin into falsely confessing to the crime.  Finally, the Defendants also induced another man,

1

Joseph Martin, to say that Kendall Austin was involved in this homicide.  The Defendants coerced Joseph Martin into saying that Kendall Austin was involved in the homicide by using the same or similar tactics as outlined above.

2.  Mr. Austin was eventually indicted based on this knowingly false information and he was jailed for more than three years before the prosecution ultimately dismissed all the charges against him.

## JURISDICTION

3.  This action is brought pursuant to 42 U.S.C. §§ 1981, 1983, 1985, 1986,1988 and the Fourth Amendment to the United State Constitution.

4.  Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343 and the previously mentioned statutory and constitutional provisions.

5.  Jurisdiction supporting Plaintiff's claim for attorney's fees is conferred by 42 U.S.C. § 1988.

## VENUE

6. This case is instituted in the United States Court for the District of Colorado pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred.

## PARTIES

7.  At all times relevant hereto, Plaintiff Kendall Austin was a resident of the State of Colorado.

8.   Defendant Sheriff Brown was, at all times relevant herein, authorized by law to maintain and did maintain a police department known as the Arapahoe County Sheriff's

Department which acted as its agent in the area of law enforcement, including, without limitation, conducting investigations and causing charges to be brought about alleged crimes.

9.  Defendant Bruce Peterson was, at all times relevant herein, an Officer with the Arapahoe County Sheriff's Department.

10.  Defendant Niki Bales was, at all times relevant herein, an Officer with the Arapahoe County Sheriff's Department.

11.  Defendant Mike Dickson was, at all times relevant herein, an Investigator with the Arapahoe County District Attorney's Office.

## FACTS

12.  On November 6, 2009, Andrew Graham was shot and killed.  Mr. Austin had no involvement whatsoever in the homicide of Andrew Graham and is completely innocent of the crime.

13.  The police had no leads and there was immense pressure to solve the crime and to close the case.

14.  After more than a year of investigating, the case was presented to a state grand jury in early 2011.

15.  During the grand jury proceedings, the District Attorney's Office presented the testimony of more than 60 witnesses and introduced more than 100 exhibits over the course of a year's worth of grand jury proceedings.

16.  Although Mr. Austin testified as a witness during these proceedings, he was not a suspect at the time and was not a target of the grand jury proceedings.[1]

---

[1] Mr. Austin testified about a statement that he had heard from a potential suspect.

17.  After hearing all the evidence, the grand jury declined to return an indictment against anyone, stating that it did not "have reliable, corroborated information from which to make decisions regarding the death of Andrew Graham."  Following the grand jury proceeding the case was closed.

18.  In 2015, more than five years after Graham was killed, the investigation was reopened by the Cold Case Unit, and the case was assigned to Defendants Peterson and Bales for reinvestigation.

19.  During the 2015 reinvestigation, the Defendants conspired together, with other Sheriff's deputies, and with members of the 18th District Attorney's Office ("DA's Office") to fabricate evidence against Mr. Austin and to seek an indictment against him.

20.  Specifically, On December 17, 2015, Peterson, Brandt, and Isaacson knowingly and intentionally coerced a statement from Joseph Martin and induced him to say that Kendall Austin was involved in the homicide of Andrew Graham.

21.  Prior to December 17, 2015, Joseph Martin had been interviewed by law enforcement at least nine different times, over the course of two years, during the initial investigation.

22.  During these prior interviews, Mr. Martin gave wildly varying accounts of his knowledge of the homicide and always maintained that he was not present at the homicide but had only heard details from others.

23.  In all of those prior interviews, Martin never once suggested that Mr. Austin was involved in or present at the homicide.

24.  All of the Defendants and their co-conspirators were either involved in, or aware of, these prior interviews with Joseph Martin.

25.  In fact, one co-conspirator, Isaacson, had conducted most of those prior interviews with Joseph Martin, most of which were recorded, and Peterson, Bales, Brandt and Dickson had either seen, heard, and/or discussed those prior interviews and/or the most important details of the interviews.

26.  On December 17, 2015, Joseph Martin was interrogated again, this time by Defendants Peterson and Brandt.  The interrogation was audio and video recorded.

27.  Isaacson also participated in this interrogation.

28.  During the interrogation, Defendant Peterson threatened Mr. Martin, telling him he could be charged with first degree murder.

29.  Defendant Peterson told Mr. Martin that he already had a warrant for Martin's arrest and that it only needed a judge's signature.

30.  However, he assured Mr. Martin that if he was only present at the homicide - only there to rob the victim but was not the actual shooter - he would be ok and have no problems.

31.  After these threats and false promises of leniency were repeatedly wielded against him - over the course of a two and a half hour interrogation - Mr. Martin, for the first time, "admitted" that he was present at and involved in the homicide.

32.  In connection with this "admission," Mr. Martin also named several other people as being involved, including Mr. Austin.[2]

---

[2] As explained in more detail below, Martin only implicated Mr. Austin after Defendant Brandt repeatedly suggested Mr. Austin's name to Mr. Martin.

33.  Joseph Martin only made these "admissions" after he was improperly coerced into saying he was there and naming other people who were supposedly involved.

34.  Joseph Martin was coerced using tactics that were very similar to the ones used to coerce Mr. Austin, as described below in more detail.

35.  These tactics included the defendants lying about what evidence they had and employing threats (i.e. unsigned arrest warrants) and false promises of leniency.

36.  It should have been obvious to all the defendants and their co-conspirators that Mr. Martin's eventual "confession" was untrue.

37.  This is because Mr. Martin kept changing his story to conform with the facts that were fed to him by the Defendants and Brandt and Isaacson.

38.  This is also because Mr. Martin changed his story in response to the threats and false promises of leniency made to him by the Defendants and Brandt and Isaacson and/or in their presence.

39.  For example, over the course of multiple interviews, spanning from November 20, 2009 to December 20, 2011, Mr. Martin resolutely maintained that he was neither present at nor involved in the homicide.

40.  Even in his December 17, 2015 interview, Mr. Martin *initially* maintained that he was neither present for nor involved in the homicide.

41.  Defendants Peterson and Brandt then informed Mr. Martin that they knew he was there the night of the murder, that they had enough evidence to charge him with first degree murder, and that they already had a warrant for his arrest that only needed a judge's signature.[3]

---

[3] No other witness had actually implicated Joseph Martin as being involved and there was no evidence linking him to the crime.  The Detectives did not actually possess a warrant for his arrest for first degree murder.

42.  But, they told him, they were only interested in sending one person to prison: the shooter.

43.  Deputy Brandt and Defendant Peterson further told Mr. Martin that they knew he was not the shooter and that they already knew who the shooter was.

44.  They told him that their case was so strong now that people were going to start getting arrested, and that other people had already been honest and told them what happened that night because they didn't want to go to prison for the rest of their lives.

45.  They told Mr. Martin they did not care about a robbery, only the murder, and they told him that the others who were there that night "told the truth" and because of that they were not locked up.

46.  However, they told Mr. Martin, if the people who were there that night "lie" then they will be charged with first degree murder.

47.  Defendant Peterson told Mr. Martin that he did not want that to happen to him, and then, over the next few minutes, told him the following:

   a.  "You have to tell me the truth, Joseph, because I know you were there, I can prove it.  I have proven it.  I have an arrest warrant on my desk."

   b.  "Tell me the truth. Tell me what you saw that night. I know you saw it."

   c.  "This is the only opportunity you're gonna get, this thing is not going away."

   d.  "My next step is to go get those warrants signed and I have to make the decision today if you stay in that pile or not, straight up."

   e.  After Mr. Martin said he did not want to stay in "that pile", Peterson responded, "Then you need to tell us a story."

48.  Approximately a minute later, Joseph Martin began telling the Defendants a story that, for the first time, involved him being present for the homicide.

49.  But, Mr. Martin's eventual "admissions" were inconsistent with other known evidence in the case.

50.  For example, in his first story on December 17, 2015, Martin told ~~Defendants~~ Brandt and Peterson that he and several others got on the light rail by the 16th Street Mall in Denver and that's where they first spotted the victim, Andrew Graham.

51.  Martin claimed that they followed Graham on the light rail down to Park Meadows Mall.

52.  The Defendants and their co-conspirators knew this could not possibly be true because they had already obtained and viewed surveillance footage from the light rail.

53.  On that footage, the Defendants and their co-conspirators were able to clearly see Andrew Graham exit the light rail at the Park Meadows Mall Station.

54.  The Defendants and their co-conspirators were also able to see that none of the suspects, including Martin and the others he named, had ridden the train with Graham or exited the light rail at Park Meadows Station with Andrew Graham.

55.  In fact, after Mr. Martin made the "admission" about the light rail, Peterson, Brandt, and Isaacson conferred in the other room about how this statement did not fit with the video and needed to be changed.

56.  Next, Isaacson entered the interrogation room and explained how the statement about the light rail was a problem.

57.  Specifically, over the course of several minutes, Isaacson told Mr. Martin the following:

    f.  "You said that you guys followed him on the train.  We have the video from that, so explain to me how you guys followed him on the train or if you want to reconsider that?"

    g.  "What you said happened doesn't quite fit with what the video is, so I'm just wondering if you want to clarify, you don't have to if you don't want to, but I think you should."

    h.  "I'm gonna say that perhaps you guys actually didn't take the train down, you may have followed the train, would that be accurate?"

58.  Immediately after Isaacson told him that his "story" did not match the light rail video, Mr. Martin changed his story and said that he did not get on the light rail train.

59.  Isaacson then suggested to Mr. Martin that maybe he got a ride from someone.

60.  In response to this, Mr. Martin then changed his story and said that he and all the other suspects got down to Park Meadows Mall that night in a stolen car.

61.  The above combined efforts by Brandt, Peterson, and Isaacson resulted in a fabrication of evidence in the form of a false and coerced statement by Joseph Martin which was eventually presented to the 2016 grand jury to obtain an indictment against Mr. Austin.

62.  This fabricated evidence generated by the Defendants and their co-conspirators was the reason that the Defendants made Mr. Austin a suspect in the murder and was used, as detailed below, as part of the improper coercion of Mr. Austin to make him falsely admit to being present at the homicide.

63. All the Defendants and their co-conspirators knew about the problems and inconsistencies with the "confessions" by Martin and Austin and worked in concert with members of the DA's Office to nonetheless pursue the case by selectively presenting evidence to the DA and to the 2016 grand jury in order to get indictments.

64. During his prior interviews, Mr. Martin had given the names of several other people that he had "heard" were present at or involved in the murder. However, he had never once identified Mr. Austin as a person who was present at or involved in the murder.

65. During the December 17, 2015 interrogation, Brandt fed Mr. Austin's name to Martin and then later asked him if Mr. Austin was present at and involved in the homicide.

66. As a result of this suggestion, Martin subsequently included Mr. Austin in his story, and told the Defendants and their co-conspirators, for the first time ever, that Mr. Austin had been present at the murder.

67. Specifically, Brandt fed Mr. Austin's name to Martin in the following ways:

    i. Approximately twelve minutes into the interrogation, Brandt asked Mr. Martin if "KG,"[4] was one of the people he knew who used to hang out downtown. Although this reference was not specifically connected to the murder, Brandt was specifically asking Martin if Mr. Austin used to hang out downtown with several of the other suspects in the murder investigation. This was the first time Mr. Austin was mentioned by anyone during this interrogation;

    j. Approximately thirteen minutes later, Brandt called Mr. Martin's attention to some of the prior statements he had given and then suggested that "KG" might

---

[4] Martin had previously identified Mr. Austin as "KG," although he had never suggested that Mr. Austin or "KG" had been present at the murder.

have been there "that day." Brandt suggested this despite the fact that neither Martin nor any other witness had ever before suggested that Mr. Austin had been present for or involved in the homicide;

k. Three minutes later, Brandt again made an unprompted reference to "KG," while discussing hypothetical scenarios with Mr. Martin about how the murder might have occurred. Specifically, Brant asked Mr. Martin, "so if Clarissa (Lady Smoke), and KG, say KG, and this dude, Spider, if they went…were they tight enough to go down there, you think, to do something like that (referring to the murder)?"

l. Martin responded that they were.

m. Brandt then told Martin, "I tried to fill you in a little bit on what we're doing, and what you, kinda refreshing your memory a little bit from back in the day, does that make sense? So you know now what we're talking about, and **who we're interested in**."

n. Finally, Brandt told Mr. Martin, "If you were there, ok, I'm not saying you were, I'm just saying if you were there *with these people*, and if you did not shoot the guy, you got no problems with us."

68. Martin only said that Mr. Austin was involved because Brandt repeatedly suggested Mr. Austin's name to him after Peterson, Isaacson and Brandt had made numerous threats and false promises of leniency.

69. It should have been patently obvious to the Defendants and their co-conspirators that Martin's eventual admissions, including that Mr. Austin was involved, were false.

70.  In addition to all of the improper tactics described above, Joseph Martin had a panic attack on video in the interrogation room after he finally succumbed to the Defendants' collective coercive tactics.

71.  This panic attack was so serious that the detectives called the paramedics to check on Mr. Martin.

72.  All the Defendants, and Brandt and Isaacson knew about these issues with Mr. Martin's various conflicting and impossible statements and yet they conspired together and with members of the DA's Office to present this evidence to the grand jury in a manner that obfuscated the inconsistencies and impossibilities in Mr. Martin's statements and allowed the grand jury to return an indictment against several suspects, including Mr. Martin and Mr. Austin.

73.  After the Defendants had successfully fabricated evidence against Mr. Austin by coercing Joseph Martin to implicate Mr. Austin in the murder, the Defendants then set about confronting Mr. Austin with this fabricated evidence.

74.  Specifically, all of the Defendants and Brandt and Isaacson then made a plan to interview Kendall Austin to try to get him to confess to the crime in order to corroborate the coerced statements of Joseph Martin in order to solve the crime and relieve the pressure of the unsolved homicide investigation.

75.  During several interviews of Mr. Austin, Defendants Bales and Peterson fed facts to Mr. Austin about the homicide and made threats and promises to him in order to induce him to confess to being involved in the homicide.

76.  Specifically, during a pair of audio recorded interviews of Mr. Austin on January 21, 2016 and February 3, 2016, Defendants Bales and Peterson told Mr. Austin that other people

were saying he was at the scene of the shooting and that they could prove he was there.  They told him they had enough evidence to charge him with first degree murder and, much like they had done to Joseph Martin a month earlier, they showed him a fake warrant for his arrest for first degree murder that they told him only was only missing a judge's signature.  All of this information was untrue and the Defendants knew it was untrue.

77.  They told him that they knew he was not the shooter and that they were only interested in getting the shooter.  They told him they did not care about a robbery.  They told him that if he tells them he was there and what he knows he would be a witness rather than a suspect and would only be looking at probation and testifying.  They told him if he did not tell them what they wanted to hear, he would be charged with first degree murder.

78.  Throughout these interviews, Mr. Austin denied all knowledge of or involvement in the murder.  At the conclusion of the second interview, Mr. Austin volunteered to provide a DNA sample and submit to a polygraph examination.

79.  The defendants then consulted with members of the DA's Office.  They told the Deputy DAs, who were their co-conspirators, that Mr. Austin had steadfastly maintained his innocence in their interviews so far and asked the DA's Office for the use of their polygrapher in order to help coerce Mr. Austin into admitting involvement by use of improper means.  Specifically, Defendant Bales emailed Deputy DA Mark Hurlbert on February 3, 2016 requesting to use the DA's polygrapher (Defendant Dickson) for this purpose.

80.  On February 16, 2016, Mr. Austin reported to the Arapahoe District Attorney's Office for the polygraph examination.  Defendant Dickson then conducted an interview and a polygraph examination of Mr. Austin regarding the homicide.

81.  After performing the polygraph examination, Defendant Dickson lied to Mr. Austin about the result of the examination in order to obtain his false confession.

82.  During that interview and polygraph examination, Dickson fed Mr. Austin facts about the homicide and made threats and promises to induce him to confess to the crime.

83.  Specifically, Defendant Dickson told Mr. Austin that the polygraph results proved that he was at the scene of the shooting and that he was not getting out of it.  However, Dickson said he did not believe Mr. Austin was the shooter but that if he continued to lie about being there people might think he was the shooter.  Further, Defendant Dickson told Mr. Austin that if he continued to lie about being present at the murder that he was going to go down.  If, on the other hand, Mr. Austin would just be honest and admit that he was there, he would receive no punishment and would be able to move on and not lose his family and his two children.

84.  Immediately following the interview with Dickson, Defendants Bales and Peterson came into the room and made additional promises of leniency and threats in order to coerce Mr. Austin to confess to the crime.

85.  Specifically,  Bales and Peterson lied and told Mr. Austin that they now knew for sure that he was there that night but that he was not the shooter and that they wanted to help him. They threatened him that if he continued to maintain that he was not at the scene of the murder, he would be charged with first degree murder.  But, they promised him, if he just told the "truth" - which they now knew involved him being present at the murder - then he would be able to walk away and go home with his family.

86.   During and before the polygraph interview, all three Defendants conspired about their plan to get the Plaintiff to confess to a crime that they knew he could not possibly have committed.

87.   During this interview, Mr. Austin eventually made several false inculpatory statements as a direct result of the numerous threats and promises of leniency wielded against him.  These statements, while facially inculpatory, were obviously false and were merely an objectively impossible amalgamation of the facts fed to him by the Defendants.

88.   Before eventually making any inculpatory statements, Mr. Austin repeatedly denied any involvement in the homicide but all of these denials were ignored and the Defendants continued to make false promises of leniency and threats in order to induce Mr. Austin to confess to a crime that they knew he had not committed.

89.   Defendants knew or should have known that Mr. Austin's inculpatory statements were false because the eventual confession was impossible based on other information known to the Defendants.

90.   For example, after being coerced, Mr. Austin eventually "admitted" that if he had gone to the Park Meadows Mall area the night of the murder, it would have been on the light rail. However, the Defendants knew that this could not possibly be true.  They had already seen the light rail video footage from the night in question.  That footage made clear that Andrew Graham was on that light rail, but neither Mr. Austin, nor any of the other people he mentioned in his coerced confession were on the light rail that night with Andrew Graham.

91.   The Defendants also knew or should have known that Mr. Austin's "confession" was false because his description of the location of the murder was materially incorrect.

92.  Mr. Austin said he observed the shooting while standing on the light rail platform. The Defendants knew that the local news had reported that the shooting happened near the light rail station.

93.  However, the Defendants knew that the shooting actually occurred more than a mile from the light rail station.

94.  The Defendants knew that it would have been impossible for Mr. Austin to have seen any of the events he described while standing on the light rail platform.

95. Not only did the shooting occur more than a mile away, but this was in a congested part of suburban Colorado which was separated from the light rail by a shopping mall, houses, neighborhoods, busy streets and strip malls.

96.  Knowing it would have been impossible for Mr. Austin to have seen the shooting from the light rail platform, Defendant Peterson confronted him on this point, telling him the following:

a.  "We're telling the truth, buddy, okay?"

b.  "But right now you're telling me half of the truth and the reason I know that is because of the crime scene, okay;"

c.  "The crime scene, even though it's in the general area of the mall, it's in the general area of the light rail, it's way far removed, okay?"

d.  "For you to hear the gunshot, or see the group of people, you had to be a lot closer than you're saying."

97.  The Defendants also knew that Mr. Austin and several other witnesses eventually described a physical robbery having been attempted before the murder.

98.  The Defendants knew that there were DNA profiles found on Andrew Graham and his possessions and those DNA profiles did not implicate any of the suspects, including Mr. Austin.

99.  The Defendants knew that nothing was taken from Andrew Graham despite the witnesses claiming that there was a robbery.

100.  Additionally, in his interview with Defendant Dickson, which was being observed in real time by Peterson and Bales, Mr. Austin made several statements which made clear that he had no actual knowledge of the crime.

101.  For example, Mr. Austin said the following during that interview:

a.  'Cause you saying that I was there, and I don't remember being there. Like, I don't understand."

b.  "Because, if I was there, I would remember it, that's the thing."

c.  "[I]f I was there, and I know how serious this is, I would admit to it, because I have two little kids at home."

d.  'Cause that's what I'm saying because, if I was there, I didn't hear no gunshot, I never, I never seen anybody get shot.  I never seen anybody get killed."

e.  "I don't remember being there, but, yes I was there, I mean, ***if that's what you want me to say***, man."

f.  "So, you're saying from downtown, if they were following people, or followed him?"

g.  "That's what I'm saying.  *If* I was there, I got on the light rail 'cause I never been in a SUV before.  So, *if* I was there. . ."

102.  Mr. Austin's statements about being present at the shooting were so equivocal and unbelievable that by the end of the interrogation Defendant Dickson remarked that "***right now I think you're just telling me that to shut me up***" right after Mr. Austin had acquiesced to his presence and then shrugged in silence when pressed for details.

103.  When asked to give details of the crime, Mr. Austin could not do so unless answers were directly fed to him or information was supplied by the Defendants.

104.  Many facts were fed to Mr. Austin during the interviews by Peterson, Bales and Dickson.

105.  For example at one of the interviews, Defendant Peterson said to Mr. Austin, "can I tell you what I think happened."  Peterson then provided Mr. Austin with a story that would best fit the rest of the known evidence so that Mr. Austin could later repeat that story.

106.  When Mr. Austin said that he would have gotten there on the light rail, which the Defendants knew was impossible because of the light rail footage they had obtained, Defendant Peterson told Mr. Austin that he believed that Mr. Austin had followed Mr. Graham in an SUV instead.

107.  The Defendants also should have known that Mr. Austin's confession was false because many of his answers were conditional.  For example, "*if* I was there, *I would have* gotten there on the light rail."

108.  But when asked open-ended questions, like tell me what happened, Mr. Austin responded, "I don't know, that's what I'm saying."

109.  Mr. Austin made several other statements during his interrogations that made it clear that he was not involved and didn't know what happened.

110.  For example, Mr. Austin stated the reason he was at the light rail station was to go to his uncle's house, by **Southlands Mall** in Smoky Hill.

111.  However, Southlands Mall was the wrong mall and the Defendants all knew it was the wrong mall.

112.  The actual shooting occurred over 12.5 miles away from Southlands Mall, near the **Park Meadows** Mall light Rail Station.

113.  Furthermore, the Southlands Mall does not even have a light rail station.

114.  Furthermore, the Defendants had reviewed statements from Mr. Austin where he explained that he had gotten information about the homicide investigation from the police, his lawyer, and from the news.

## PROCEEDINGS IN THE CRIMINAL PROSECUTION

115.  The Defendants had written and oral communications and meetings with Deputy DAs from the 18th DA's Office.  At these meetings, and during these communications, the Defendants discussed the problems with the case with the Deputy DAs.

116.  These problems included all the issues and inconsistencies with Mr. Austin's statements and with the case mentioned above.  The Defendants and members of the DA's Office all discussed how to best present the case to the grand jury despite all of these problems and inconsistencies with the case.  Together, the Defendants and their co-conspirators (members of the DA's Office), came up with a plan to introduce a very limited amount of information to the grand jury in order to get an indictment against Mr. Austin and others.

117.  In the lead up to the commencement of the 2016 grand jury, the Defendants repeatedly exchanged emails with each other and with members of the DAs Office regarding the

progress of the investigation and the nature of the evidence in the case.  For example, on June 8, 2016, roughly a month and a half before the grand jury commenced, the Defendants informed Deputy DA Kellner via email that Mr. Austin was "excluded from all DNA in the case."

118.  This plan included purposely omitting scores of exculpatory evidence which had resulted in a NO TRUE BILL in the previous attempt at indictment in 2011.  This plan also included having Joseph Martin testify in such a way that his testimony would match some of the evidence in the case and to make sure that the grand jury never learned of all of Mr. Martin's previous contradictory and wholly inconsistent prior statements to law enforcement.

119.  In addition, the Defendants conspired with members of the DAs office regarding how an unrelated investigation in downtown Denver could be helpful in prosecuting Mr. Austin and his co-defendants.  Specifically, in a February 25, 2016 email, Deputy DA John Kellner told the Defendants that "the 16th street mall case" could be "very helpful in prosecuting the Graham case" and inquired about whether the Defendants had spoken to the detectives in *that* case. Ultimately, information related to this Denver investigation was presented to the grand jury through the testimony of those Denver detectives.

120.  During the presentation of the case to the grand jury, the Defendants exchanged emails with members of the DAs Office discussing and planning for the presentation of testimony and evidence and scheduling meetings and prep sessions to discuss what the Defendants would "be testifying about" before the grand jury.

121.  On January 18, 2017, after the Defendants and their co-conspirators carried out their plan to present misleading and false evidence to the grand jury, Plaintiff was indicted by the 2016 grand jury for the homicide of Andrew Graham.

122.   Plaintiff's false and coerced confession was used to garner his indictment, despite the fact that the Defendants and their co-conspirators knew that the confession was false.

123.   The Defendants and their co-conspirators also caused Joseph Martin's knowingly coerced statements to be submitted to the grand jury.

124.   Based on this fabricated evidence being introduced into evidence before the 2016 grand jury, and based on exculpatory evidence being purposely withheld, Plaintiff was indicted for murder and criminal proceedings were commenced against him.

125.   During Mr. Austin's criminal prosecution, a suppression hearing was held at which Mr. Austin alleged his statements were coerced and involuntarily in violation of due process. Although the trial court denied Mr. Austin's motion and ruled that his statements were voluntary, Mr. Austin was not permitted at that hearing to fully litigate that issue or the issues presented in this lawsuit.

126.   For example, Mr. Austin had hired a false confession expert who had reviewed the various confessions related to the case, however, the trial judge would not allow that expert to testify at the suppression hearing.

127.   The trial judge also prohibited Mr. Austin from asking Defendants Peterson, Bales, and Dickson several questions including, specifically, questions about their training as it relates to interrogation practices.

128.   The trial Court did not allow Mr. Austin to ask Defendants Peterson, Bales, and Dickson whether or not they were lying during their interrogations about various forms of evidence.

129.  The trial court did not allow Mr. Austin to ask Defendants Peterson, Bales, and Dickson about other exculpatory evidence that they were aware of which made Mr. Austin's "confession" obviously false.

130.  Mr. Austin never had an opportunity to appeal the trial court's ruling or the trial court's refusal to permit certain evidence at the suppression hearing because the case was dismissed by the District Attorney.

131.  Mr. Austin was never permitted to litigate the validity of the confession with a jury because the case was dismissed by the District Attorney.

132.  Plaintiff spent nearly 3 years in jail awaiting trial.  On October 2, 2019 all charges against the Plaintiff were dismissed by the District Attorney's Office.

133.  The dismissal was not part of any plea bargain, compromise, or leniency offered by the District Attorney or requested or accepted by Mr. Austin.

134.  In a six page written motion to dismiss, the District Attorney provided the following reasons for the dismissal:

    a.  "Our evaluation of the current state of the evidence in this case now leads us to the difficult decision that we no longer have a reasonable likelihood of success at trial and must therefore dismiss this case;"

    b.  "Mr. Austin was not implicated until a 2015 statement by a cooperating witness (Joseph Martin), and his co-defendants, while implicating themselves, do not also implicate Mr. Austin;"

    c.  "There is also a general lack of forensic evidence related to Mr. Austin;" and

d.  "While Mr. Austin's own words indicate he was, at a minimum, a witness to the homicide, his statements do not go as far as his co-defendants' statements in admitting culpability in the felony murder."

135.  The Defendants and the District Attorneys knew all of the above information, yet they chose to work together to falsely indict and charge Mr. Austin despite this knowledge.

## MUNICIPAL LIABILITY

136.  Peterson, Bales, Dickson, Brandt, and Isaacson used all the aforementioned tactics over a course of several years during their investigation of this case.

137.  The threats, promises of leniency, ruses about fake warrants, and feeding of facts, was a pattern used by the Defendants in this case against many different witnesses and suspects over a period of years.

138.  The Defendants were trained how to conduct interrogations during their time at the police academy.

139.  The Defendants received further training regarding interrogations throughout their careers with the Arapahoe County Sheriff's Office.

140.  The tactics used, as described above, were taught to the individual Defendants in their various law enforcement trainings and the Defendants believed that these tactics were sanctioned and authorized by their training.

141.  Aside from the conduct that occurred during this case and which lasted for several years, one of the Defendants was involved in a similar campaign to coerce a false confession against a different criminal Defendant in a different case.

142.  The conduct complained of in that case was memorialized in *Sanchez v. Hartley*, 13-cv-1945(WJM).

143.  In that case, Defendant Dickson acted jointly with other police officers from a neighboring jurisdiction (Douglas County), in order to fabricate evidence in the form of a false confession.

144.  In that case, the deputies used Dickson to give a false polygraph examination to that criminal defendant to try to get him to implicate himself in the crime.

145.   In fact, just weeks prior to his interview and polygraph examination of Kendall Austin in this case, the 10th Circuit Court of Appeals held that the allegations against Dickson and the other Defendants in *Sanchez* were sufficient to make out a constitutional violation against that Plaintiff, Mr. Sanchez.  *Sanchez v. Hartley*, 810 F.3d 750 (10th Cir. 2016).

146.  Despite this ruling from the 10th Circuit Court of Appeals, Defendant Dickson and the other Defendants carried out their plan to coerce Mr. Austin's confession as described above.

147.  The conduct complained of in Mr. Sanchez's case was very similar to the conduct alleged in this case, showing that there was a custom or practice of using this type of coercion to fabricate evidence and to obtain unwarranted prosecutions.

148.  For example, the Plaintiff in *Sanchez* made very conditional and equivocal statements; so much so that the detectives asked him if he was just telling them what they wanted to hear.  *Sanchez*, 810 F.3d at 756.

149.  Likewise, in this case, Mr. Austin's admissions were so equivocal and unbelievable that Defendant Dickson asked him, "I don't believe you about being on the light rail…I…I… are

you just saying that just to make me happy?"  Seconds later, Mr. Austin exasperatedly told Defendant Dickson that he did not know what happened because he wasn't there.

150.  None of the defendants were ever investigated or sanctioned or counseled or punished in any way for their conduct in this case despite their obvious use of improper tactics.

## FIRST CLAIM FOR RELIEF
## 42 U.S.C. § 1983-Malicious Prosecution in violation of the Fourth Amendment
## (Against All Individual Defendants)

151.  Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

152.  At the time of the above events, Plaintiff had the clearly established constitutional right to be free from malicious prosecution without probable cause under the Fourth Amendment.

153.  Any reasonable police officer, including the Defendants in this case, knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.  There existed Tenth Circuit law on this issue before the events complained of which are articulated above.

154.  The individual Defendants and their co-conspirators violated Kendall's Fourth Amendment rights to be free from malicious prosecution without probable cause and without due process when they worked in concert to secure an indictment based on his coerced statements and the coerced statements of Joseph Martin to secure false charges against him, resulting in his unlawful confinement and prosecution.

155.  The Defendants conspired together and with their co-conspirators and/or acted in concert to institute, prosecute and continue a criminal proceeding for Felony Murder, against Kendall Austin without probable cause.

156.  Defendants and their co-conspirators coerced Kendall to falsely incriminate himself and then willfully, maliciously, in bad faith, and in reckless disregard of Kendall's federally protected constitutional rights, perpetuated the use of Kendall's false statements and the coerced statements of Joseph Martin to secure his arrest and prosecution.

157.  The criminal proceedings against him terminated in Kendall's favor. The District Attorney's Office dismissed all charges for which Kendall had been arrested, indicted and prosecuted on October 2, 2019.

158.  The acts and omissions of all individual Defendants and their co-conspirators were moving forces behind Kendall's damages.

159.  These individual Defendants acted in concert with each other and with their co-conspirators.

160.  The acts or omissions of Defendants and their co-conspirators as described herein intentionally deprived Kendall of his constitutional and statutory rights and caused him other damages.

161.  Defendants are not entitled to qualified immunity for the complained of conduct.

162.  The Defendants to this claim at all times relevant hereto were acting pursuant to municipal/county custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in its actions pertaining to Kendall.

163.  As a proximate result of Defendants' and their co-conspirators' conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial. Plaintiff is further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 - Conspiracy
### (Against all Individual Defendants)

164.    Plaintiff relies on all of the above facts in asserting this claim.

165.    Defendants together, and with their co-conspirators, reached an understanding, engaged in a course of conduct and otherwise conspired among and between themselves, and with their co-conspirators, to deprive Plaintiff of his due process rights by maliciously prosecuting him, fabricating evidence, manipulating witness testimony, suppressing exculpatory evidence, and falsifying charges in order to indict, arrest, and prosecute Plaintiff on without probable cause.

166.    Defendants' and their co-conspirators' misconduct was malicious, willful, and committed with reckless indifference to the rights of others.

167.    Defendants also conspired together and with their co-conspirators against Plaintiff to abuse the judicial process, to defame him, intentionally cause emotional distress, and to interfere with his prospective economic advantage.

168.    As a proximate result of Defendants' and their co-conspirators' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as

described herein entitling him to compensatory and special damages, in amounts to be determined at trial.

169.    Plaintiff is further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

### THIRD CLAIM FOR RELIEF
**Violation of 42 U.S.C. §1983 - Deliberately Indifferent Policies, Practices, Customs, Training, and Supervision in violation of the Fourth, Fifth, and Fourteenth Amendments and in violation of 42 U.S.C.§1981**
***Monell* Claim Against the Municipal Defendants**

170.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

171.   Sheriff Brown, through his office, had in effect, both before and at the time of the events alleged in this complaint, several interrelated *de facto* policies, practices and customs, including, *inter alia*:

> a.  a policy, practice and custom of manipulating and fabricating evidence;
>
> b.  a policy, practice and custom of failing to properly train or supervise officers in the proper techniques of investigating serious crimes;
>
> c.  a policy, practice and custom of using coercion, isolation, intimidation, manipulation, deceit, false promises, threats and other unlawful and improper methods to secure false confessions;
>
> d.  a policy, practice and custom of failing to properly discipline officers who violate the United States Constitution or law, or otherwise transgress the rights of criminal suspects during their investigation; and

e.  a policy, practice and custom of immediate public vilification of persons accused of "high-profile" crimes with concomitant refusal to consider evidence inconsistent with that portrayal.

172.  These interrelated policies, practices and customs, separately and/or together, were implemented with deliberate indifference, and were a direct and proximate cause of Kendall's Constitutional violations and injuries, as set forth above.

173.  These interrelated policies, practices and customs, separately and/or together, were the direct and proximate cause of the injury and damage to Kendall and violated his rights guaranteed by the United States Constitution.

174.  The existence of these interrelated policies, practices and customs can be inferred from numerous incidents reflecting a pattern of police misconduct like that alleged herein.

175.  The existence of these interrelated policies, practices and customs can be inferred from the fact that the incidents of police and prosecutor misconduct alleged herein were authorized by individuals with policymaking authority in the Police Department.

176.  Defendants are not entitled to immunity for the complained of conduct.

177.  Sheriff Brown and his office were, at all times relevant, policymakers for his office, and in that capacity established policies, procedures, customs, and/or practices for the Sheriff's Office.

178.  In light of the duties and responsibilities of those police officers that participate in arrests and preparation of police reports on alleged crimes, the need for specialized training and supervision is so obvious, and the inadequacy of training and/or supervision is so likely to result

in the violation of constitutional and federal rights such as those described herein that the failure to provide such specialized training and supervision is deliberately indifferent to those rights.

179.  The deliberate indifference to training and supervision by Defendant Sheriff resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to the Defendants and was the moving force in the constitutional and federal violations complained of by Kendall Austin.

180.  As a direct result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages.  Plaintiff is further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

## PRAYER FOR RELIEF

Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the Defendants and grants:

A.  Compensatory and punitive damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount of $7,000,000, or such greater amount as may be set by a jury;

B.  Economic losses on all claims allowed by law;

C.  Special damages;

D.  Attorneys' fees and the costs associated with this action under 42 U.S.C. §1988, including expert witness fees, on all claims allowed by law;

E.  Pre- and post-judgment interest at the lawful rate; and

F.  Any further relief that this court deems just and proper, and any other appropriate relief at

law and equity.

## **REQUESTS FOR A TRIAL BY JURY**

A trial by jury is hereby demanded on each and every one of the claims as pled herein.

Dated:          Denver, Colorado
                December 15, 2022

                                        Respectfully submitted,

                                        /s/  David N. Fisher (#48253)
                                        **FISHER & BYRIALSEN, P.L.L.C.**
                                        4600 S. Syracuse Street, 9th Floor
                                        Denver, Colorado 80237
                                        T: 303-256-6345
                                        David@ FBLaw.org